RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WILLIAM R. BAUER,

*Defendant-Appellant*.

No. 22-3240

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:19-cr-00490-1—Jack Zouhary, District Judge.

Argued: April 27, 2023

Decided and Filed: September 25, 2023[*]

Before: KETHLEDGE, WHITE, and STRANCH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Orville E. Stifel, II, ORVILLE E. STIFEL, II, CO., LPA, Cleveland, Ohio, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Orville E. Stifel, II, ORVILLE E. STIFEL, II, CO., LPA, Cleveland, Ohio, John B. Gibbons, JOHN B. GIBBONS, ATTORNEY AT LAW, Cleveland, Ohio, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

───────────────

[*]An unpublished opinion issued in this case on August 28, 2023. The panel has decided to file an amended published opinion.

———————————

**AMENDED OPINION**

———————————

JANE B. STRANCH, Circuit Judge.  Dr. William Bauer most recently practiced as a Board-certified neurologist in Bellevue, Ohio.  He regularly prescribed a high quantity of controlled substances to his patients for pain management.  The Drug Enforcement Agency (DEA) investigated Bauer for these prescribing practices, and he was ultimately indicted for unauthorized distribution of controlled substances to 14 of his patients.  A jury found him guilty on all counts, and he timely appealed.  He raises two issues stemming from the Supreme Court's intervening decision in *Ruan v. United States*, 142 S. Ct. 2370, (2022), and two evidentiary issues.  Because we find that the district court did not plainly err in instructing the jury regarding the appropriate *mens rea* and did not otherwise err, we **AFFIRM**.

## I.  BACKGROUND

### A.  Factual Background

Dr. William Bauer was 85 at the time of his sentencing, and had worked as a physician for over fifty years.  In a decorated career, he earned his doctorate in neuropathic pain, held faculty appointments at medical schools, extensively published research, and had a laboratory named in his honor at the University of Toledo.  But some of Bauer's published research was "controversial," particularly his philosophy that "[i]f you're not addressing [a patient's] pain, you're not addressing the patient."

Most recently, Bauer focused on pain management at Advanced Neurologic Associates, Inc. (ANA) in Ohio.  Bauer's clinical practice included the regular prescribing of controlled substances, including oxycodone, hydrocodone, fentanyl, morphine, and other opiates—drugs that are used clinically to treat pain but are also highly addictive and prone to abuse.  His prescribing practices became the subject of a DEA investigation after the agency received complaints from state-level medical agencies.  Bauer was indicted under a provision of the Controlled Substances Act that makes it a crime for any person to knowingly or intentionally distribute or dispense controlled substances "except as authorized."  *See* 21 U.S.C. § 841(a).  The

indictment charged Bauer with 76 counts of unauthorized distribution of controlled substances related to his prescribing practices concerning 14 patients, all of whom were referred to him by other physicians or medical clinics.[1]

Bauer prescribed opioids to each of the 14 named patients (the Patients). The Government's expert, Dr. Timothy King, opined that Bauer did so despite not sufficiently establishing a diagnosis. For example, in some cases, Bauer failed to order confirmatory diagnostic testing, and in one case, he prescribed opioids even when objective imaging showed no indication of the claimed injury. Bauer sometimes failed to treat patients with conservative therapies, like physical therapy, prior to prescribing opioids. Dr. King also opined that Bauer ignored significant "red flags" that made these patients poor candidates for opioid use because of a higher risk of addiction or abuse. In addition to physical conditions, each patient had a history of at least two mental health conditions—depression, anxiety, bipolar disorder, PTSD, suicidal ideation, suicide attempts, and schizophrenia, among others—and several patients had a history of illegal drug use.

Bauer often started patients on a low dose and increased it over time. At the time of trial, the Center for Disease Control (CDC) recommended that practitioners reevaluate patients taking opioids when they reached a morphine equivalent (MEQ) dose of 50 or more due to a "significant risk of overdose and death," and Dr. King explained that a MEQ dose between 90 and 100 is an "extreme concern" that exposes a patient to a "10 [times] increase in severe life threatening problems." At the state level, the Ohio Medical Board considers MEQ doses exceeding 80 to be "potentially dangerous and addictive." Nonetheless, Bauer drastically exceeded these thresholds over time. At some point, he prescribed all 14 patients an MEQ dose of at least 157, most of their MEQ doses peaked between 225 to 345, though three patients' doses went as high as 520, 525, and 725. Bauer also prescribed opioids in tandem with other controlled substances, like benzodiazepines, sedatives, and stimulants—drug combinations that exposed patients to risks of addiction, overdose, and death. One of the named patients died from an accidental overdose with a combination of these drugs in her system.

---

[1]The indictment also charged Bauer with health care fraud in violation of 18 U.S.C. § 1347, but he does not challenge those convictions on appeal.

Over years of opioid treatment prescribed by Bauer, none of the Patients showed improvement in their functioning or pain levels. Conversely, the patients displayed a number of concerning behaviors including: requesting specific medications; requesting higher doses; requesting early refills; losing medications; failing drug screenings; engaging in "pharmacy shopping"; and expressly admitting to drug addiction and abuse. In response, Bauer often failed to comply with ANA's own policies and pain contracts regarding pill counting, drug screenings, and patient termination, and he repeatedly approved requests for early prescription refills.

Bauer knew ANA received calls reporting that his patients were diverting their medications, including selling them, and were stealing medications from other patients. And he inconsistently ordered drug screening and pill counts based on these reports. On one occasion, a local drug task force officer called to alert Bauer that a patient was selling his pills and purchasing fake pills to cheat on pill counts. Bauer did not terminate the patient; instead, he provided additional prescriptions. Another patient continued to receive prescriptions from Bauer despite reports that the patient was offering to purchase other patients' medications in the parking lot of the clinic. There were also signs of diversion in drug screenings that revealed the presence of *no* controlled substances despite Bauer's prescriptions.

Bauer's high-dose prescription practices—along with other red flags—led local pharmacists to express concerns. Several pharmacies notified Bauer's office that they would no longer fill his prescriptions, but Bauer dismissed these concerns.

Dr. King opined that Bauer prescribed opioids "in most cases" to support "addiction and dependency," "without a legitimate medical purpose" and outside the usual course of medical care, and concluded that a "prudent physician" would not have followed Bauer's prescription practices.

## B. Procedural Background

A grand jury indicted Bauer on charges of unauthorized distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1) and health care fraud in violation of 18 U.S.C. § 1347. Prior to trial, the Government moved to exclude all but one of Bauer's twelve proffered expert witnesses as unqualified and to preclude Bauer from testifying as an expert in his own

defense for failure to timely comply with Federal Rule of Criminal Procedure 16's disclosure requirements. On the eve of trial, the district court granted the motions in part.

Trial proceeded, and the parties jointly submitted jury instructions. Ultimately, a jury convicted Bauer on all counts in the indictment. The district court imposed a 60-month sentence, far below the applicable Guidelines range.

## II. ANALYSIS

Bauer appeals his convictions for unauthorized distribution and appeals the district court's ruling excluding his experts, including himself. During the pendency of appeal, the Supreme Court decided *Ruan v. United States*, holding that the crime of unauthorized distribution includes as an element that the defendant subjectively knew the distribution was unauthorized; that is, it is not sufficient that the distribution was objectively unauthorized. 142 S. Ct. 2370, 2375 (2022). Bauer raises four issues on appeal. Two rely on *Ruan*: whether there was sufficient evidence for a jury to find that he subjectively knew his prescriptions were unauthorized; and whether the district court plainly erred in instructing the jury regarding the same. The other two issues are related to the district court's evidentiary rulings: whether the district court abused its discretion in declining to find Bauer's proffered experts qualified; and whether the district court violated his constitutional rights by not allowing him to testify as an expert in his own defense. We review these issues in turn.

### A. Issues Related to *Ruan*

We start with an overview of the statute of conviction and the Supreme Court's recent opinion in *Ruan*. The indictment charged Bauer with violating a provision of the Controlled Substances Act, 21 U.S.C. § 841, which proscribes the following:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
>
> > (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]

21 U.S.C. § 841(a)(1). Registered doctors are among those "authorized" to prescribe controlled substances but only when the doctor "issued [the prescription] for a legitimate medical

purpose . . . acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a) (2021); *see* 21 U.S.C. § 802(21).

In *Ruan*, the Supreme Court addressed whether § 841(a)'s general *mens rea* provision—knowingly or intentionally—applies to the "except as authorized" clause. 142 S. Ct. at 2375. In other words, "is it sufficient for the Government to prove that a prescription was *in fact* not authorized, or must the Government prove that the doctor *knew* or *intended* that the prescription was unauthorized?" *Id.* The Court selected the latter subjective standard, referencing the presumption of scienter in criminal statutes and analogous precedent. *See id.* at 2376-79. *Ruan* expressly rejected an "objectively reasonable good-faith effort" *mens rea* standard that would have merely required a showing that the defendant "did not even make an objectively reasonable attempt to ascertain and act within the bounds of professional medicine." *Id.* at 2381. But the Court was careful not to bar all consideration of objective criteria. The relevant regulation language—"legitimate medical purpose" and "usual course" of "professional practice"—reflects that objective criteria are still relevant to the extent they are circumstantial evidence of a defendant's knowledge of lack of authorization. *Id.* at 2382. It explained the relationship between objective criteria and knowledge further:

> As we have said before, "the more unreasonable" a defendant's "asserted beliefs or misunderstandings are," especially as measured against objective criteria, "the more likely the jury . . . will find that the Government has carried its burden of proving knowledge." But the Government must still carry this burden.

*Id.* (quoting *Cheek v. United States*, 498 U.S. 192, 203-04 (1991)).

*Ruan* clarified that once a defendant produces evidence that he falls within the authorization exception, the Government has the burden of proving lack of authorization—that a defendant knew or intended that his conduct was unauthorized—beyond a reasonable doubt. *Id.* at 2380-82. The Supreme Court declined to give guidance on formulating jury instructions consistent with its holding and remanded the consolidated cases to the respective circuit. *Id.* at 2382.

Bauer argues that, considering *Ruan*, there was insufficient evidence for the Government to meet its burden regarding the requisite *mens rea* and that the district court improperly instructed the jury.

1. Sufficiency of the Evidence

We review challenges to the sufficiency of the evidence de novo. *United States v. Robinson*, 813 F.3d 251, 255 (6th Cir. 2016). Viewing the evidence in the light most favorable to the prosecution, we ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Matthews*, 31 F.4th 436, 446 (6th Cir. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*). Bauer disputes only the element requiring subjective knowledge or intent to distribute controlled substances without authorization.

Bauer claims that there is not a "scintilla of evidence" that he subjectively knew his prescriptions were unauthorized. (Appellant Br. at 19-20). Instead, he points to evidence that he maintained extensive medical charts for each of the relevant patients; that the patients were referred to him by other practitioners because of their difficult chronic pain presentations; his assessments of the patients and his gradual progression from prescribing conservative pain therapies, like physical therapy and anti-inflammatory drugs, to slowly increasing dosages of opioids as a "last resort"; and finally, that he lacked any financial incentive to overprescribe opioids.

To be sure, Bauer's assertion that no evidence exists regarding his subjective intent may be true regarding *direct* evidence, but review of the record shows ample circumstantial evidence from which a jury could infer that he did have the required subjective knowledge of unauthorized distribution—evidence we must credit at this stage of review.

Viewed in the light most favorable to the Government, there was extensive evidence that Bauer failed to adequately examine the patients, establish diagnoses, consider red flags, or attempt more conservative treatment options—all in violation of the standard of care espoused by the Government's expert, Dr. King. To cite a few examples: There was evidence that Bauer vastly exceeded MEQ dosage thresholds established by federal and state agencies even though there was no indication that the named patients' functioning or pain levels were improving, and that he also prescribed dangerous combinations of controlled substances. Despite these high-risk dosages, Bauer failed to enforce clinic policies consistently and adequately regarding pill counts,

drug screenings, and patient retention. Further, he ignored open and obvious signs indicating that patients—several of whom were admittedly addicts—were diverting their medications; in fact, he subsequently prescribed those patients *more* controlled substances. Eventually, several pharmacies refused to fill Bauer's prescriptions. At trial, Dr. King opined that all these actions were outside the usual course of professional conduct and not for any legitimate medical purpose. While direct evidence was lacking, the compounding of this circumstantial evidence "especially as measured against objective criteria" allows an inference that Bauer had subjective knowledge. *Ruan*, 142 S. Ct. at 2382. A jury could credit this evidence and find that Bauer *knew* his prescriptions were without authorization, satisfying *Ruan*'s *mens rea* requirement. *See id.*

### 2. Jury Instructions

We generally review challenges to jury instructions under the abuse of discretion standard, *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010), but we have reviewed "the legal accuracy of jury instructions de novo," *United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010). The instructions as a whole are reviewed to determine whether they adequately informed the jury of relevant considerations and "provided a basis in law for aiding the jury in reaching its decision." *United States v. Emmons*, 8 F.4th 454, 470 (6th Cir. 2021) (quoting *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005)). But because Bauer failed to object to the jury instructions—indeed, he jointly submitted them—we review his challenge under the plain error standard. *See United States v. Howard*, 947 F.3d 936, 944-45 (6th Cir. 2020) (applying the plain error standard where defendant challenged jury instructions he jointly submitted with Government).[2] The plain error standard requires (1) an error, (2) that was obvious or clear, (3) that affected the defendant's substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). An error affects a defendant's substantial rights when there is "'a reasonable probability that, but for the error,' the outcome of the proceeding would

---

[2]The Government raises the invited error doctrine to foreclose Bauer's challenge to the jury instructions, but invited errors may be excused when, as here, the Government jointly invited the error and a defendant claims a constitutional violation. *See Howard*, 947 F.3d at 945.

have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76, 82 (2004)). We judge plain error under the law at the time of our decision. *Johnson v. United States*, 520 U.S. 461, 467-68 (1997).

Here the district court instructed the jury that to find Bauer guilty of unauthorized distribution of controlled substances the Government had to prove beyond a reasonable doubt the following elements:

(1) Defendant **distributed** or **dispensed** Schedule II, IV and/or V controlled substances . . .;

(2) Defendant acted **knowingly** in distributing or dispensing these controlled substances; and

(3) Defendant's act was not for a legitimate medical purpose in the **usual course of his professional practice**.

(R. 144-1, Jury Instructions, PageID 1493 (emphasis in original); R. 228, Trial Tr., PageID 6016).

The district court then defined and explained the relevant terms related to the elements of the offense:

> "Knowingly" means the act was done voluntarily and intentionally, and not because of mistake or accident. Knowledge of Defendant cannot be established merely by demonstrating that he was careless or negligent or foolish. But knowledge may be inferred if Defendant deliberately blinded himself to the existence of a fact. No one can avoid responsibility for a crime by deliberately ignoring the obvious.
>
> If you are convinced that Defendant deliberately ignored a high probability that the controlled substances as alleged in these counts were distributed or dispensed outside of the course of the professional practice and not for a legitimate medical purpose, then you may find that Defendant knew that this was the case. But you must be convinced beyond a reasonable doubt that Defendant was aware of a high probability that the controlled substances were distributed or dispensed outside the course of professional practice and not for a legitimate medical purpose, and that Defendant deliberately closed his eyes to what was obvious.
>
> "Usual course of professional practice" means that the practitioner has acted in accordance with a standard of medical practice generally recognized and accepted in the United States. A doctor's own individual treatment methods do not, by themselves, establish what constitutes a "usual course of professional practice." In making medical judgments concerning the appropriate treatment for an

individual, however, doctors have discretion to choose among a wide range of available options.

You have heard the phrase "standard of care" used during the trial by several witnesses. When you go to see a doctor as a patient, the doctor must treat you in a manner that meets the applicable standard of care that doctors of similar training would have given to you under the same circumstances. If a doctor fails to provide you with that care, the doctor may be found negligent in a civil lawsuit. This case is not about whether Defendant acted negligently or whether he committed malpractice. Rather, in order for you to find Defendant guilty, you must find that the Government has proved to you beyond a reasonable doubt that Defendant's action was not for a legitimate medical purpose in the usual course of professional practice.

(R. 144-1, PageID 1494-95; R. 228, PageID 6017-18).

The court concluded its charge on the unauthorized distribution counts by instructing the jury regarding Bauer's requested good faith defense, providing two different formulations of good faith:

Defendant argues he treated his patients in good faith. If a doctor dispenses a drug in good faith in the course of medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of accepted medical practice. That is, he has dispensed the drug lawfully.

"Good faith" means good intentions and an honest exercise of professional judgment as to a patient's medical needs. It means Defendant acted in accordance with what he reasonably believed to be proper medical practice. In considering whether Defendant acted with a legitimate medical purpose in the course of usual professional practice, you should consider all of Defendant's actions and the circumstances surrounding them.

"Good faith" also means an objective good faith attempt to comply with the law, as measured against the actions of a reasonable doctor under the circumstances, allowing for reasonable mistake or misunderstanding. If you find that an ordinary doctor, under the same or similar circumstances, would have made the same mistake or harbored the same misunderstanding, you may conclude that Defendant was acting in good faith.

Defendant does not have to prove to you that he acted in good faith; rather, the burden of proof is on the Government to prove to you beyond a reasonable doubt that Defendant acted without a legitimate medical purpose outside the course of usual professional practice. If you find that Defendant acted in good faith in dispensing the drugs charged in any one or more of Counts 1 through 76 of the Indictment, then you must find Defendant not guilty on those counts.

(R. 144-1, PageID 1495-96; R. 228, PageID 6018-19).

On appeal, Bauer argues that the district court plainly erred in its instruction on the good-faith defense, pointing only to the paragraph that described the defense as an "objective good faith attempt to comply with the law" and measured good faith in reference to the actions of a "reasonable doctor under the circumstances." He claims these objective considerations were rejected in *Ruan* and their use improperly allowed the jury to convict him on a negligence standard. For its part, the Government argues that no error occurred when the instructions are viewed holistically. It emphasizes that the instructions (1) tied the phrase "legitimate medical purpose" in the third element to the second element's "knowingly" *mens rea*; (2) included an explanation of deliberate ignorance regarding unauthorized distribution, and (3) defined good faith in subjective terms in addition to the objective terms.

Between briefing and oral argument in this case, we published an opinion addressing substantially similar jury instructions in light of *Ruan* in another unauthorized distribution case involving a doctor. *See United States v. Anderson*, 67 F.4th 755, 764-66 (6th Cir. 2023) (per curiam). In *Anderson*, the jury instruction on the elements of the crime included that the doctor "knowingly or intentionally dispensed or distributed" a controlled substance and did so "without a legitimate medical purpose and outside the course of professional practice." *Id.* at 766. The trial court provided the same deliberate ignorance instruction that Bauer received here, including instruction that if the jury found Anderson had deliberately ignored the unauthorized nature of his prescriptions, then it could "find that the defendant knew this was the case." *Id. Anderson* held that "by referring continuously to the 'knowledge of the defendant,' his 'deliberate ignorance,' [whether] he 'knew' that the prescriptions were dispensed illegitimately," and juxtaposing "'knowledge' with '[c]arelessness, negligence, or foolishness,'" Anderson's jury instructions "appear[ed] to comport with *Ruan*." *Id.*

In several respects, Bauer's instructions were the same as those in *Anderson*. The district court in this case similarly juxtaposed knowledge with lesser levels of culpability. It explained that the act could not be done by "mistake or accident," and that Bauer's knowledge could not be established by demonstrating that he was "careless or negligent or foolish." The instructions specifically informed the jury that "[t]his case is not about whether [the] Defendant acted

negligently or whether he committed malpractice."  And Bauer's instructions included the same deliberate ignorance instruction that asked the jury to consider whether Bauer "deliberately ignored a high probability that the controlled substances . . . were distributed or dispensed outside of the course of professional practice and not for a legitimate medical purpose," and if so, it could determine Bauer "*knew that this was the case*."  (R. 144-1, PageID 1494 (emphasis added)).  Our precedent, moreover, has explained that a deliberate ignorance instruction does not expound "a standard less than knowledge; it is simply another way that knowledge may be proven."  *United States v. Mitchell*, 681 F.3d 867, 877 (6th Cir. 2012) (quoting *United States v. Severson*, 569 F.3d 683, 689 (7th Cir. 2009)).

To be sure, unlike the jury in *Anderson*, Bauer's jury was instructed on the defense of good faith—a defense that *Ruan* likely makes obsolete.  The court provided two alternative definitions for "good faith."  One definition missed the mark; it called for the jury to measure Bauer's actions against those of a "reasonable doctor under the circumstances."  (R. 144-1, PageID 1496).  The other ostensibly defined good faith in subjective terms—"good intentions and an honest exercise of professional judgment"—but it too included a seemingly objective consideration regarding what Bauer "*reasonably* believed to be proper medical practice."  (*Id.*).  While these instructions might have muddied the water, the district court made clear that Bauer did not have to prove his good faith to avoid a conviction; rather, it reiterated that the burden of proof was on the Government.

We agree with the Government's concession at oral argument that these are not the instructions that should be used in unauthorized distribution cases going forward.  In our view, the instructions in *Anderson*—and thus here as well—do not fully comport with *Ruan*. *See Anderson*, 67 F.4th at 771-73 (White, J., concurring in part and dissenting in part).  Further, although there was certainly evidence that Dr. Bauer ignored many red flags and veered from the objective standard of care, there was also evidence that all 14 patients were referred by other doctors for pain management, Bauer's practice did not resemble a typical "pill mill," Bauer had a long history as a prominent physician on the vanguard of pain management, and he had no financial incentive to overprescribe opioids.  Under these circumstances, a jury properly instructed to focus on Bauer's subjective knowledge and intent to prescribe controlled substances

without a legitimate medical purpose and outside the course of professional practice might well have found him not guilty. But *Anderson* controls and requires that we find the jury instructions adequate. And all told, considering the binding nature of *Anderson* and the instructions given in this case regarding the Government's burden of proof to convict, we cannot say that plain error occurred.[3] *See United States v. Sakkal*, 2023 WL 3736778, at *5-7 (6th Cir. May 31, 2023) (holding that similar instructions "cannot be 'plain error' in light of our published precedent in *Anderson*").

## B. Evidentiary Issues

Bauer raises two evidentiary challenges on appeal: First, he challenges the exclusion of his proffered expert witnesses, and second, he argues he had a constitutional right to testify as an expert in his own defense.

### 1. Bauer's Proffered Experts

Bauer argues that the district court abused its discretion in allowing only one of his proffered experts to testify. Bauer sought to certify an extensive number of witnesses as experts, including physicians, medical professors, nurse practitioners, a radiologic technologist, a pharmacist, and an office manager. Prior to trial, the Government moved to exclude all but one of Bauer's proffered expert witnesses, and the district court held a hearing to receive testimony from the nurse practitioners, the radiologic technologist, and the pharmacist. On the eve of trial, the district court granted the Government's motions in part. The district court grouped the experts by profession and then individually analyzed each expert. Regarding several of Bauer's proposed physician experts, the district court deferred its judgment, ruling that "more information [was] needed" to determine whether those experts were qualified and authorized the Government to "examine [the two physician] witness[es] prior to [their] jury testimony," should Bauer call them. The court disqualified several other proposed experts, including a medical

---

[3]The jury instructions in this case are distinguishable from those examined by the Tenth and Eleventh Circuits on remand from *Ruan*. *See United States v. Kahn*, 58 F.4th 1308, 1311 (10th Cir. 2023); *United States v. Ruan* (*Ruan II*), 56 F.4th 1291, 1295 (11th Cir. 2023) (per curiam). First, we are reviewing Bauer's instructions for plain error, not harmless error. Second, the jury instructions in those cases did not include an instruction, like the deliberate indifference instruction here, that connected the knowledge *mens rea* to the lack of authorization or other language indicating a heightened level of culpability.

professor, two nurse practitioners, the radiologic technologist, the pharmacist, and the office manager. Ultimately, only one physician testified as an expert on Bauer's behalf at trial.

We review a district court's decision whether to admit expert testimony under an abuse of discretion standard. *United States v. LaVictor*, 848 F.3d 428, 440 (6th Cir. 2017). Federal Rule of Evidence 702 governs the admissibility of expert testimony, and district courts are assigned a "gatekeeping role" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589, 597 (1993). "[T]he test of reliability is 'flexible,'" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Bauer argues that his proffered expert witnesses should have been allowed to testify because each was at least minimally qualified. Bauer, however, waived this issue by failing to develop it. As noted, the district court made specific findings and drew legal conclusions regarding each of Bauer's proffered experts individually. For example, the court found that two of the physicians did not appear to have experience in treating chronic-pain patients and another had only a minimal connection to a pain medicine that was not at issue. The court also found that one of the nurse practitioners "was unable to articulate the relevant standard of care and appeared unfamiliar with the standards for pain-management patients," and had limited relevant experience. (R. 136, PageID 1441). Bauer does not engage with the district court's findings or reasoning regarding any expert and fails to explain how the district court abused its discretion. That failure to "raise any specific challenges to the district court's decision . . . waive[s] those challenges."[4] *Kuhn v. Washtenaw County*, 709 F.3d 612, 624-25 (6th Cir. 2013) ("[A]rguments adverted to in only a perfunctory manner [] are waived.")

Bauer resists this conclusion on reply by arguing that he makes one simple, general argument regarding all of his proffered experts that were DEA registered to prescribe controlled

---

[4]Bauer listed only eight proffered experts in his opening brief but mentioned three more in his reply. The Government moved to strike those portions of the reply brief concerning these three proffered experts. Because we do not typically consider issues raised for the first time in a reply brief, we hold that Bauer waived any argument related to those three experts. *See United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002). The Government's motion is therefore denied as moot.

substances:  He claims that DEA registration automatically qualified these witnesses as experts in the standard of care applicable to pain management doctors.  We do not agree.  To hold that these witnesses are automatically qualified—irrespective of any other considerations—would bypass the gatekeeping function bestowed on district courts by Rule 702 and constrain the considerable discretion those courts have in performing it.  *See United States v. Sammons*, 55 F.4th 1062 (6th Cir. 2022).

### 2. Bauer as an Expert

Bauer argues that the district court violated his Fifth and Sixth Amendment rights by not allowing him to testify as an expert in his own defense based on his failure to comply with Federal Rule of Criminal Procedure 16's disclosure requirements.

Rule 16 states that a defendant must provide the government with reciprocal discovery for expert witnesses.  Fed. R. Crim. P. 16(b)(1)(C)(i).  While the timing of the disclosure is within the district court's discretion, it must be "sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence."  *Id.* 16(b)(1)(c)(ii).  An expert disclosure must include "a complete statement of all opinions" of the witness, the bases and reasons for those opinions, the "witness's qualifications," and a list of cases in which, during the previous four years, the witness has provided expert testimony.  *Id.* 16(b)(1)(C)(iii).  If a party fails to comply with this rule, the district court has discretion to exclude the evidence or order other remedies.  *Id.* 16(d)(2).

Bauer argues that Rule 16's disclosure requirements cannot be construed to apply to a criminal defendant seeking to testify as an expert in his own defense.  He contends that doing so infringes on his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel because it required him to decide before trial whether he would exercise his right to remain silent, and if not, to provide the Government with a summary of his testimony prior to trial.

As an initial matter, Bauer's challenge appears to be more appropriately framed as implicating his right to present a defense under the Fifth Amendment's Due Process Clause rather than his Fifth Amendment right against self-incrimination or his Sixth Amendment right to

counsel. The district court's ruling did not preclude Bauer from choosing whether to testify as a fact witness at a time of his choosing—a right he ultimately exercised—and it did not deprive him of counsel. The pretrial disclosure requirements would not have prohibited Bauer from invoking his right to remain silent at trial. But the ruling arguably could have infringed on Bauer's constitutional right "to present a complete defense," *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), and his right to testify on his own behalf, *United States v. Stover*, 474 F.3d 904, 908 (6th Cir. 2007). The right to present a complete defense is not absolute, however, and "federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials" as long as the rules are not arbitrary or "'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). Bauer fails to mention this analytical framework and thus does not present an argument suggesting that Rule 16 is arbitrary or disproportionate to the purposes it is designed to serve.

In any event, the district court's application of Rule 16 was not arbitrary or disproportionate to the rule's purpose here. The purpose of Rule 16's expert witness disclosure is to allow parties a fair opportunity to cross-examine expert witnesses and to secure opposing expert testimony if necessary. There is no dispute that Bauer failed to comply with these requirements, and we have often held that district courts do not abuse their discretion by excluding defense experts for failure to comply with Rule 16. *See, e.g., United States v. Pittman*, 816 F.3d 419, 425 (6th Cir. 2016). The Tenth Circuit, moreover, has held that a district court's exclusion of a defendant's own expert testimony did not violate his constitutional right to present a defense, *United States v. Bishop*, 926 F.3d 621, 626-27 (10th Cir. 2019), and on our review, no court has found a constitutional right to testify *as an expert* in one's own defense. We decline to do so in this case. *Cf. Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) ("The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system . . .") (emphasis removed) (quoting *United States v. Nobles*, 422 U.S. 225, 241 (1975)); *United States v. Lang*, 717 F. App'x 523, 537-38 (6th Cir. 2017) (holding that exclusion based on willful violation of Rule 16's disclosure requirements did not violate defendant's right to call witnesses or right to present a complete defense).

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.